Columbia, November, 1872.

HEARD NOVEMBER TERM, 1872.

STATE *ex rel.* SHIVER *vs.* COMPTROLLER GENERAL.

Where a writ of *mandamus* would be vain and fruitless and without any beneficial effect, or where it would introduce confusion and disorder, or where it is manifestly improper, it will not be granted.

Where an Act of the Legislature directed the State Treasurer to issue certain scrip to be received in payment of taxes and other dues of the State, and directed an annual tax to be levied for the redemption of the scrip, it is sufficient ground for the refusal of *mandamus* to compel the Comptroller General to order the levy, that the State and County Treasurers are enjoined from receiving the scrip on the ground that it is null and void.

The Revenue Bond Scrip, issued by the State Treasurer, under the Act of March 2, 1872, "to relieve the State of South Carolina of all liability for its guaranty of the Bonds of the Blue Ridge Railroad Company," being certificates of indebtedness, payable to bearer, issued by the State in its sovereign capacity, with the faith of the State pledged for their ultimate redemption, and intended to circulate as money, are bills of credit, which, by the Constitution of the United States, a State is inhibited from issuing, and are, therefore, null and void.

Where an annual tax is directed to be levied for the purpose of redeeming bills of credit, issued by the State in contravention of the Constitution of the United States, *mandamus* will not lie to compel the Comptroller General to order the levy to be made.

Where an annual tax is directed to be levied for the redemption of certain bills of credit, which are null and void, *mandamus* will not be granted directing a levy of the tax to pay the indebtedness for which the bills were issued.

This was a petition to the Supreme Court by Robert C. Shiver, J. P. Southern, W. C. Swaffield and W. B. Gulick, against Solomon L. Hoge, as Comptroller General of the State, praying for a writ of *mandamus.* It set forth :

I. That by an Act of the General Assembly of said State, duly passed on the second day of March, 1872, entitled "An Act to relieve the State of South Carolina of all liability for its guaranty of the bonds of the Blue Ridge Railroad Company, by providing for the securing and destruction of the same," it was enacted as follows:

SEC. 1. *Be it enacted* by the Senate and House of Representatives of the State of South Carolina, now met and sitting in General Assembly, and by the authority of the same, That the State Treasurer is hereby directed, with the consent, in writing, of the President of the Blue Ridge Railroad Company, in South Carolina, to require the Financial Agent of the State, in the city of New York, immediately to deliver to the State Treasurer all the bonds of the Blue Ridge Railroad Company, endorsed and guaranteed by the State of South Carolina, which are now in his possession, and held by him as collateral security, for advances made by the said

Financial Agent, by the order of the Financial Board, to the Blue Ridge Railroad Company; and, upon the delivery of the said bonds, the Treasurer is hereby required to cancel the same, in the manner hereinafter directed; and the said Blue Ridge Railroad Company shall thereupon be discharged from all liability to the State on account of such advance.

SEC. 2. That upon the surrender by the said company to the State Treasury of the balance of the said four million of dollars of bonds, issued by the said Blue Ridge Railroad Company, and guaranteed by the State, the State Treasurer is hereby authorized and required to deliver to the President of the Blue Ridge Railroad Company, in South Carolina, Treasury Certificates of Indebtedness (styled Revenue Bond Scrip) to the amount of one million eight hundred thousand dollars, the said certificates to be executed in the manner hereafter directed; and if the said company shall not be able to deliver all of the said bonds at one time, the Treasurer is authorized and required to deliver to the said President such amount of such Treasury Certificates as shall be proportioned to the amount of bonds delivered.

SEC. 3. That, to carry out the purpose of this Act, the State Treasurer is hereby authorized and required to have printed, or engraved on steel, as soon as practicable, Treasury Certificates of Indebtedness, to be known and designated as Revenue Bond Scrip of the State of South Carolina, in such form and of such denominations as may be determined on by the State Treasurer and the President of the Blue Ridge Railroad Company, in South Carolina, to the amount of one million eight hundred thousand dollars, which Revenue Bond Scrip shall be signed by the State Treasurer, and shall express that the sum mentioned therein is due by the State of South Carolina to the bearer thereof, and that the same will be received in payment of taxes and all other dues to the State, except special tax levied to pay interest on the public debt.

SEC. 4. That the faith and funds of the State are hereby pledged for the ultimate redemption of said Revenue Bond Scrip, and the County Treasurers are hereby required to receive the same in payment of all taxes levied by the State, except in payment of special tax levied to pay interest on the public debt, and the State Treasurer and all other public officers are hereby required to receive the same in payment of all dues to the State; and, still further to provide for the redemption of said Revenue Bond Scrip, an annual tax

of three mills on the dollar, in addition to all other taxes, on the assessed value of all taxable property in the State, is hereby levied, to be collected in the same manner and at the same time as may be provided by law for the levy and collection of the regular annual taxes of the State; and the State Treasurer is hereby required to retire, at the end of each year from their date, one-fourth of the amount of the Treasury Scrip hereby authorized to be issued, until all of it shall be retired, and to apply to such purpose exclusively the taxes hereby required to be levied.

II. That subsequently to the passage of this Act, the said Blue Ridge Railroad Company did surrender three millions three hundred and ninety-four thousand dollars of the said bonds, issued by the said Blue Ridge Railroad Company, and guaranteed by the State, into the State Treasury, as provided for in and by the second Section of said Act, as above recited.

III. That upon the surrender of said bonds, as before set forth, the State Treasurer did deliver to the President of the Blue Ridge Railroad Company, in South Carolina, Treasury Certificates of Indebtedness, (styled Revenue Bond Scrip,) to the amount of one million seven hundred and ninety-six thousand eight hundred and twenty-three and fifty-three one hundredths dollars, which said certificates were executed in the manner and form and of the denomination required and prescribed by the third Section of said Act above recited.

IV. That your petitioners are now the owners and holders, for good and valuable consideration, in their own right and as trustees for others, of the amount of four hundred and fifty-eight thousand three hundred and five dollars of said Treasury Certificates (styled Revenue Bond Scrip,) whereof the denominations and numbers are fully set forth in a certain paper hereunto annexed, and marked "Exhibit A," to which exhibit your petitioners refer as part and parcel of this their petition.

V. That the Comptroller General of said State is the officer now charged by law with the duty of giving notice to the several County Auditors of the said State of the rate per centum of taxes authorized by law to be levied upon the property of the State, for the use of the State; and that the Hon. Solomon L. Hoge is now the Comptroller General of the State.

VI. That by the laws of said State the Comptroller General is required, on or before the fifteenth day of November in each year,

to give notice to each County Auditor of the rates per centum authorized by law to be levied for the various State purposes, which rates, or per centum, shall be levied by the County Auditor on the taxable property of the County, and charged on the duplicate with the taxes required to be levied and collected for other purposes.

VII. That notwithstanding his duty as Comptroller General to give the said notice to the said County·Auditor of the annual tax of three mills on the dollar on the assessed value of all taxable property in the State, and to levy, or cause to be levied, the said tax of three mills on the dollar, for the redemption of the said Revenue Bond Scrip, as required by the fourth Section of the said Act above recited, and in disregard of the legal rights of your petitioners as owners and holders, for value, of said Revenue Bond Scrip, the Hon. J. L. Neagle, who was the Comptroller General of said State until the 7th day of December, in the present year, did neglect and refuse to give said notice to the several County Auditors of the State of the rate per centum of three mills on the dollar, as by law he was bound to do, and as is required by the said fourth Section of said Act above recited; and the said Solomon L. Hoge, who has been, since the 7th of December in the present year, and is now the Comptroller General of said State, has neglected and refused, up to the present time, and does now neglect and refuse to give the said notice to the several County Auditors of the State of the said rate per centum of three mills on the dollar on all the taxable property of the State, for the redemption of the said Revenue Bond Scrip, or to levy, or cause to be levied, the said annual tax of three mills on the dollar, as by the said fourth Section of the said Act above recited he is required to do.

VIII. That your petitioners are wronged and injured, and deprived of their legal rights in the premises by the said neglect and refusal of the said Solomon L. Hoge, Comptroller General, as aforesaid, to give said notice of said rate per centum of three mills on the dollar of tax to redeem the said Revenue Bond Scrip, as hereinafter set forth, and to levy, or cause to be levied, the said annual tax as required by the said fourth Section of said Act above recited; and that your petitioners are without remedy in the premises, unless it be afforded by the interposition of this honorable Court by their writ of *mandamus;* and they, therefore, pray that a writ of *mandamus* may issue out of this Court against the said Solomon L. Hoge, Comptroller General, as aforesaid, commanding him to give the said

notice to the County Auditors of each County in said State of the said rate per centum of tax of three mills on the dollar on the assessed value of all the taxable property of the State for the redemption of the said Treasury Certificates (styled Revenue Bond Scrip) now held by your petitioners, and to levy, and cause to be levied, the said tax, as provided for in and by the said fourth Section of said Act before recited; and that such other order may be had in the premises as justice may require, to the end that said tax, when levied and collected, may be applied to the redemption of said Treasury Certificates of Indebtedness (styled Revenue Bond Scrip) now owned and held by your petitioners.

A rule to show cause, dated December 19, 1872, and returnable January 2, 1873, having been issued and served on the Comptroller General, he filed a return, as follows:

Solomon L. Hoge, Comptroller General of the said State, upon whom has been served a rule issued by this honorable Court, ordering him to show cause before this said Court why a writ of *mandamus* should not issue commanding him to give notice to the several County Auditors of the said State of the rate per centum of three mills on the dollar on the assessed value of all the taxable property of the State for the redemption of the Treasury Certificates, (styled Revenue Bond Scrip,) alleged to be now owned and held by the petitioners, and to levy, and cause to be levied, the said tax, as provided for in and by the fourth Section of the Act recited in the said petition, and that such other order may be had in the premises as justice may require, to the end that the said tax, when levied and collected, may be applied to the redemption of the said Treasury Certificates, (styled Revenue Bond Scrip,) alleged to be now owned and held by the petitioners, for return and answer to the said rule, and for cause why a writ of *mandamus* should not issue as suggested, sets forth and shows as follows:

1. Because, by the provisions of the Act of March 2, 1872, no portion of the said certificates are required to be retired until after the expiration of twelve months from their date; that before the expiration of that time no suit can be had in behalf of any private individual under the said Act; and that if any wrong has been done, or any breach of duty required by the said Act, such wrong or breach is a public wrong, and can only be remedied at the suit of the Governor or Attorney General, or some officer of the Executive Department.

2. Because no demand has ever been made upon the Comptroller General to give notice to the County Auditors of each County of the annual tax of three mills on the dollar on the assessed value of all taxable property in the State for the redemption of the said Treasury Certificates, (styled Revenue Bond Scrip,) held by the petitioners, and to levy and collect, and cause to be levied and collected, the said taxes provided for by the fourth Section of the Act of the General Assembly passed on 2d March, 1872, and recited in the petition filed in this case.

3. Because the General Assembly was induced to enact the Act of March 2, 1872, by the representation of the Blue Ridge Railroad Company that the conditions required by the Act of 15th September, 1868, entitled "An Act to authorize additional aid to the Blue Ridge Railroad Company, in South Carolina," had been complied with, and that the State of South Carolina had become liable to pay the bonds of the said Blue Ridge Railroad Company, authorized by the said Act; and this respondent avers, and for cause shows, that the said representation was not true; that the State was not liable to pay the said bonds, or any part thereof, and that the consideration had failed which had led the General Assembly to direct the issue of the certificates mentioned in the said Act of 2d March, 1872; that the said Blue Ridge Railroad Company, and all the persons who became holders of the said certificates, had notice before or at the time they received the same; and this respondent, as the chief fiscal officer of the State, is bound by his duty to interpose until the said defense of the State can be made in the proper tribunals, and to submit the same as a sufficient objection to the extraordinary remedy by writ of *mandamus*.

4. Because the Act of March 2, 1872, recited in the petition, is unconstitutional, null and void, in that it is repugnant to the Constitution of the State.

5. Because the said Act is null and void, in that it is repugnant to the Constitution of the United States, which ordains (Article 1, Section 10,) that "no State shall emit bills of credit, or make anything but gold and silver coin a tender in payment of debts."

6. Because the Act of March 2, 1872, evinces in its various provisions a design to effect what is declared unconstitutional by the State and Federal Constitutions ; that all its provisions are connected in subject matter, depending on each other, and operating together for the same purpose, and are illegal and void ; that more

especially the provision which makes the levy and requires the collection of the tax of three mills is intended to give effect to this violation of the Constitution, and is, therefore, unconstitutional and void; and that the said provision does not impose upon this respondent any duty which can be enforced by the judgment of any Court, either by writ of *mandamus* or otherwise.

7. Because, in conformity with the Constitution of the State, (Article II, Section 30,) this respondent has taken his oath of office, by which he has sworn to support, protect and defend the Constitution of the United States and the Constitution of South Carolina, and he cannot be required to levy or collect a tax, or perform any other act in furtherance of objects inconsistent with either of said Constitutions, or with this respondent's oath of office.

8. Because the annual Tax Act for the current year has already been passed by the Legislature, and the levy in pursuance thereof was actually made previous to the service of the rule in this case; and no further levy and collection of taxes for any purpose can be made until the lapse of the current fiscal year.

9. Because, under proceedings duly had in the Courts of this State, the said Act of March 2, 1872, has been declared null and void, and the said certificates mentioned in the petition have been declared illegal, and the various officers of the State in the Treasury Department thereof have been enjoined from receiving or issuing the same; that such proceedings are still pending, and it would have been, and is now, unlawful for this respondent to take the action prayed for in the petition.

10. Because, even should the said proceedings terminate in declaring the provisions of the said Act to be legal, it will become a financial question at what time to levy and collect the tax set forth in the said Act, the solution of which belongs to the discretion of the Executive Department of the Government.

To the above return the relators filed a reply as follows:

I. These relators, replying to the first cause set forth in the return of the respondent herein, say:

That by the fourth Section of the said Act of March 2, 1872, it is expressly enacted that "to provide for the redemption of said Revenue Bond Scrip, an annual tax of three mills on the dollar, in addition to all other taxes, on the assessed value of all taxable property in the State, is hereby levied, to be collected in the same

manner, and at the same time, as may be provided by law for the levy and collection of the regular annual taxes of the State;" that this provision of the said Act imposes upon the Comptroller General the duty of giving notice to the County Auditors of the required tax, in the same manner and at the same time with the other annual taxes levied by the State, to wit, on or before the fifteenth day of November in each year; and that the said tax must be levied and collected prior to the expiration of one year from the date of the said scrip, in order to enable the State Treasurer, as required by said Act, to retire one-fourth of the amount thereof; that upon the neglect or refusal of the Comptroller General to give said notice, any holder and owner of said scrip is entitled to demand the aid of this Court to enforce said duty.

That the said neglect or refusal is a public wrong, in the sense only that it is a neglect and violation of duty by a public officer, of evil example to the community; but that, as a legal or pecuniary wrong, it affects only the rights of such as are owners and holders of the said scrip, and that they are entitled to seek redress for their private wrongs, growing out of the neglect and violation of duty by a public officer.

II. And for reply to the second cause set forth in said return, these relators say: That it is not required by law that these relators should have demanded from the respondent a performance of his duty as a public officer, to wit: the giving notice to the County Auditors of the said tax to redeem the said scrip, because, as a public officer, he is charged by law, and by his oath of office, with the performance of that duty, and no private individual is required to demand of a public officer the performance of a duty plainly enjoined by law.

III. And for reply to the third cause set forth in said return, these relators say:

1. That in said third cause respondent alleges that "the General Assembly was induced to enact the Act of March 2, 1872, by the representation of the Blue Ridge Railroad Company; that the conditions required by the Act of 15th September, 1868, entitled 'An Act to authorize additional aid to the Blue Ridge Railroad Company, in South Carolina,'" had been complied with, and that this representation was not true. To this the relators reply that they are ignorant if any such representations were made, but they deny, as matter of law, that it is of any consequence whether such allega-

tion be true or not, because, among other reasons, as matter of law, the said condition of the Act of September 15, 1868, had been, by a subsequent Act, anterior to the Act of March 2, 1872, repealed.

2. That, in said third cause, respondent alleges that "the General Assembly was induced to enact the Act of March 2, 1872, by the representation of the Blue Ridge Railroad Company, that * * * the State of South Carolina had become liable to pay the bonds of the said Blue Ridge Railroad Company, authorized by said Act," and that this representation was not true. To this the relators reply that they are ignorant if any such representations were made; but, if such representations were made, they deny that such allegation is material to the issue here made, because the consideration for the issue of said Revenue Bond Scrip, fully set forth in the Act of March 2, 1872, together with the admitted liability of the State, is recited as follows: "Whereas the State of South Carolina, &c., has endorsed a guarantee of the faith and credit of the State on four million of dollars of bonds, issued by the Blue Ridge Railroad Company, * * * which bonds are liable for the debts of the said railroad company; and whereas the present condition of the finances of the State, and of said company, is such as to make the further continuance of said bonds on the market inexpedient and unadvisable, and a serious injury and prejudice to the credit of the State; and whereas the existence of the said four million of dollars of bonds so guaranteed create a large liability on the part of the State, which the Treasurer may be required to meet at unforeseen and inopportune times; and whereas the liability of the State on account of such guarantee should be faithfully met and discharged; therefore, in order to secure the recovery and destruction of the bonds and coupons of the said company, issued under and in pursuance of the aforesaid Act, now pledged in the city of New York and elsewhere, and to relieve the State of all liabilities whatever, by reason of its endorsement and guarantee of said bonds," thus shewing that the consideration was the recovery and destruction of said bonds, and the relief of the State from the alleged and admitted liability therefor.

And the relators further say that this consideration was fully and completely received by the State in the return into the Treasury thereof of three million three hundred and ninety-four thousand of the said guaranteed bonds by the said Blue Ridge Railroad Com-

pany, which said bonds have been cancelled and destroyed by the State authorities, in pursuance of the said Act of March 2, 1872.

And this consideration the relators have fully stated in their petition, and the respondent has not and does not venture to deny it, which failure to deny is an admission of the truth thereof.

And the relators further say that they do not deny, but admit, notice of the consideration on which said scrip was authorized and issued, and they have already shewn that the respondent, by his failure to deny their statement, that the consideration has been received by the State, is in law a full admission that the consideration had not failed, and he is bound thereby.

And, further, that upon the issue of the bonds, for the recovery and destruction of which the said Revenue Bond Scrip was issued, a preliminary injunction against the endorsement of said bonds was sought and obtained, but upon full hearing before Hon. S. W. Melton, Judge of the Fifth Judicial Circuit, the said injunction was dissolved, and the additional security of a judicial decision was thus given to the Act of the Legislature, and the highest sanction to the bonds, the delivery of which to the State makes the consideration of the present scrip.

The relators are not aware that the respondent is the chief fiscal officer of the State, and even if his office has assumed such extraordinary precedence, they are not aware of what duty of his office requires him to interpose his own construction of an Act of the Legislature between the recognized liability of the State and the payment of its creditors, thus driving those who trusted its pledges to the expense and delay of a costly and dilatory suit, and endangering the credit of the State itself.

IV. And for reply to the fourth cause, set forth in said return, these relators say :

That the said Act of March 2, 1872, is not unconstitutional nor void by reason of anything set forth or alleged in said fourth cause in said return contained, but that, on the contrary, the said scrip is issued under the express authority conferred by the Constitution of the State upon the General Assembly.

V. And for reply to the fifth cause set forth in said return, these relators say :

That the said Act of March 2, 1872, is not repugnant to the Constitution of the United States, which ordains that " no State shall emit bills of credit or make anything but gold and silver coin a tender in payment of debts."

VI. And for reply to the sixth cause set forth in said return, these relators say :

That the said Act of March 2, 1872, evinces no design to effect what is declared unconstitutional by the State or Federal authorities ; that the levy of the said tax of three mills was designed in good faith to protect the rights of those who should become, like these relators, the owners and holders of said scrip, and that whether said scrip be lawful or not, or whether said scrip be receivable for taxes or not, cannot affect the right of these relators, who are owners and holders thereof for good and valuable consideration, to claim its redemption in accordance with the said fourth Section of the Act of March 2, 1872 ; but that, on the contrary, the said fourth Section imposes upon this respondent the duty of levying the said tax of three mills, irrespective of the question of the validity, or legality, or constitutionality of the said scrip, in respect to its issue, its original purposes, its receivability for taxes, or its re-issue in payment of dues from the State.

VII. And for reply to the seventh cause set forth in said return, these relators say :

That these relators do not seek to require or compel the performance by this respondent of any act inconsistent with either the Constitution of this State or of the United States, nor in conflict with his oath of office as Comptroller General, but that, on the contrary, they seek only to compel the performance of a duty which, by his said oath of office, he is required to perform.

VIII. And for reply to the eighth cause set forth in said return, these relators say :

That this respondent cannot, in law, be excused from the performance of his duty in this behalf, because, by his wrongful neglect and refusal to perform his duty, the annual taxes had been levied previous to the service of the rule herein ; that such an excuse, if allowed, would put the rights of these relators at the constant mercy of this respondent, since it could never be charged that he was neglecting his duty in these premises until he had suffered the time to pass by when the regular annual taxes of the State are levied ; that if this Court shall award the relief herein sought, the respondent can, without delay or legal impediment, proceed to give the proper notice of said tax, and cause the same to be duly collected.

IX. And for reply to the ninth cause set forth in said return, these relators say :

That it is not unlawful for the respondent to levy the said tax because of any thing set forth in said ninth cause in said return ; that said proceedings therein referred to, by which the said scrip has been declared null and void, do not have for their object to prevent the levy of the tax demanded by these relators, and that no decision can be rendered in said proceedings which will reach the subject-matter or object which the petition herein of these relators embraces.

X. And for reply to the tenth cause set forth in said return, these relators say :

That the right of these relators to demand the levy of the said tax is a right which depends upon the legal meaning and effect of the language used in the said fourth Section of the said Act of March 2d, 1872 ; that if it shall be adjudged that the said Section requires this respondent to levy the said tax, it will then become his legal duty to levy said tax without reference to the financial views of this respondent or of any State officers, and without the exercise of any discretion on his or their part.

To the reply the respondent filed a rejoinder as follows :

The respondent, by way of rejoinder to the reply of the relators, says that, by reason of anything in said reply stated, the said writ of *mandamus* should not be granted, because, he says :

1. That, as to the first ground taken in the return of this respondent, the allegations therein contained are sufficient in law to maintain the position of the respondent.

2. That, as to the second ground taken in the return of this respondent, the allegations therein contained are sufficient in law to maintain the position of this respondent.

3. As to so much of the reply of the relators as is in answer to this respondent's averment of the consideration for the issue, by the State, of the said Revenue Bond Scrip, this respondent rejoins that the consideration, as stated in the said reply, and in the recital made therein, is not truly stated ; and that the consideration was the alleged fact that the State had become and was liable to pay the bonds that had been issued by the Blue Ridge Railroad Company, when, in truth, no such fact existed, and no such liability had been incurred.

4. As to the fourth ground, this respondent avers the said Act to

be repugnant to the Constitution of this State, and, therefore, unconstitutional, null and void.

5. As to the fifth ground, this respondent avers the said Act to be repugnant to the Constitution of the United States, null and void.

6. As to the sixth ground, this respondent avers that the Act of March 2, 1872, does evince the design set forth in the return, and that all the provisions thereof are unconstitutional, null and void.

7. As to the seventh clause of the reply, this respondent rejoins: That the act sought to be performed is inconsistent with the Constitution of this State, and with that of the United States; is in conflict with respondent's oath of office, and is not a duty which he can be required to perform.

8. This respondent denies that, by reason of any thing set forth in the eighth ground of the reply, he can be required to proceed to give notice of said tax, and cause the same to be collected.

9. This respondent insists that nothing set forth in the ninth ground of the reply is a sufficient answer to the cause shewn in the ninth ground of his return.

10. This respondent insists that nothing set forth in the relators' tenth ground of reply is a sufficient answer to the cause shown in the tenth ground of his return.

On which said several matters and things this respondent prays judgment of this honorable Court.

*Memminger,* with whom was *Pope & Haskell,* for respondent:

I. This rule must be discharged, for the following reasons:

1. Because there is a subsisting judgment declaring these certificates, and the Act which authorized them, unconstitutional, null and void; and, until that judgment be reversed, no Court in the State can lawfully enforce their payment.

2. Because the relators have no present standing in Court to ask the issuing of a writ of *mandamus.*

3. Because there is no demand.

Demand is absolutely necessary, and a refusal or something equivalent, (Tapping, 84;) and at page 283 it is laid down that both demand and refusal must be shown by the affidavits in support of the application.—*King* vs. *Navigation Co.,* 30 E. C. L., 81; *King* vs. *Leicester,* 10 E. C. L., 466.

4. Because, under the Constitution, but one annual collection of taxes can be had, and the arrangements for the present year were completed before the commencement of these proceedings.

5. Because there was no default in the Comptroller in not including this tax, as the injunction prevented any dealing with the scrip ; and it is now a question of sound discretion whether, under such circumstances, any levy should be made.

In support of the first and second of the above reasons, the following authorities are cited :

*The King* vs. *Bishop of Chester,* 1 Term R., 404. A *mandamus* is intended to give execution to a legal right where the legal remedy is inadequate. A legal right is the first essential foundation for the writ.

In *The King* vs. *Archbishop of Canterbury,* 8 East., 219, Lord Ellenborough, C. J., says: "There ought, in all cases, to be a specific legal right, as well as the want of a specific legal remedy, in order to found an application for a *mandamus.*

In *The King* vs. *Commissioners of Excise,* 2 Term R., 465, the Court say an application for *mandamus* is addressed to the discretion of the Court. It is a prerogative writ, and not a writ of right, therefore the Court ought not to grant it, unless they see that the official (against whom it is asked) has *done wrong.*

Tapping, Mand., 15, 19. The object of the writ is to prevent a failure of justice. A strong political necessity for.it must exist.

The relators in this case have nothing to do with the collection of the tax. Their scrip may never have any claim upon the tax. For, either it may all come into the treasury in payment of taxes, and it may never be paid out again, and no wrong could then be suffered by the holders, neither does it follow that this particular scrip would be the first to be retired.

No default is committed by the State, or injury suffered by the holders, until a refusal to retire.

All the Pennsylvania cases cited on the other side are cases of past due liabilities, which the holders were entitled to have paid from the moneys which the *mandamus* ordered to be collected.

In those cases there was a specific legal right, while in this tax there is no specific right.

The tax was intended to construct a sinking fund to give credit to the new currency.

These considerations would compel the Court to discharge this particular rule.

But as we desire to have the Court decide the case on grounds so broad as to secure the best interest of the State, and also to prevent future litigation, we submit the following more extended views :

We submit, then :

1. That these certificates are illegal, being issued in violation of the State and Federal Constitutions.

2. That, being thus illegal, no obligation exists to pay them, and no Court can assist to enforce their payment, and a tax on the citizen, for the purpose of paying them, is illegal and cannot be collected.

3. That the certificates are in the nature of contracts—that, as such, they must be sustained by a legal and sufficient consideration—that the failure of the consideration, or a false representation of such consideration, vitiates the contracts as between the original parties and all subsequent parties with notice.

1. Is the issue of these certificates forbidden by the Constitution of the United States ?

For the argument on this point I refer to the opinion of Mr. J. Willard.

The features impressed on these certificates, which distinctly bring them within the meaning of the Constitution, are :

1. The form which they take. They are to be of all denominations, and to be steel-plate engravings, which have been made of the size and form convenient for circulation—in fact, just like bank notes.

2. They are given currency by being receivable from any one for taxes or dues at the treasury.

3. May pass to any holder.

4. They are not extinguished by being delivered in at the treasury, but remain with the Treasurer as money.

5. They may be re-issued, and probably will furnish the only means of payment at the treasury.

They, therefore, clearly come within the description given by the decided cases of what is meant by bills of credit.

Moreover, they produce the evils against which the Constitution intended to protect the country.

Being not redeemable in coin or in United States currency, they must necessarily constitute a debased currency, but with value sufficient to cause a circulation.

They will, therefore, inflict upon the country the evils of a depreciated currency similar to the Continental and State Bills during the revolutionary war—the assignats in France, and the late Confederate currency.

Their volume is so large that it must disturb values, and thereby affect all the relations of the country, the whole amount being more than is required for the entire circulating medium of the State.

The public creditors and all salaried officers will necessarily suffer greatly, as those certificates will absorb the entire treasury, and the Treasurer will have nothing else to pay with. The necessities of officers will compel them to receive payment in this scrip, and to submit to the loss arising from their depreciation.

It is obvious that it was to prevent such consequences that this clause of the Constitution was ordained.

But this issue is also a violation of the State Constitution.

This position, according to arrangement of counsel, has been referred to Messrs. Pope & Haskell for argument, and I refer to their elaborate and well considered arguments for the points and authorities in detail. I shall merely submit a condensed summary of the whole.

I. The sovereignty of the State does not reside in either of the three departments among which its powers are distributed, but each of them acts in virtue of a delegation of those powers.

This result follows from Article I, Section 41, which ordains that "all powers not therein delegated are reserved to the people."

"Inherent" power, therefore, can be claimed by none but by the people—all other claimants must show a delegation.

The Legislature, just like the Executive, must show the delegation of proper powers before they can exercise them; and where the delegation is attended by a direction as to the mode of exercise, the same effect will follow as in other cases of delegated authority.

The Legislature generally expresses its will in the same form in which it makes laws, and that has led to the mistaken conception that the power to make laws includes all functions that might be exercised in the same form.

But it is not so. For, a Bill of Pains and Penalties, or what is more familiar to the British Parliament under the name of a Bill

of Attainder, could not be enacted by our Legislature, simply because it is a judicial and not a legislative act.

So the erection of public buildings, and the levy of taxes, are not legislative, although generally executed in that form now in this country.

But in many countries these functions are performed by the Executive Department, and it was only after a long struggle that the taxing power was retained by the English Parliament.

Our State Constitution has not left this matter in doubt.

By Article IX it has settled the whole department of finance, taking it completely out of the general power to make laws, and strictly prescribing the extent of this power and the mode of using it.

The subject naturally divides into two primary classes : supply—expenditure.

The supply of a government can come from two sources only—taxes and loans.

Its expenditures fall into three classes—ordinary expenses of sustaining the government, extraordinary expenses, and debts already incurred.

And, as nations are now constituted, these classes of financial matters must exist at the inception of any government or constitution, and must be dealt with by that constitution.

How does our State Constitution dispose of them?

1. As to the means of supply, to wit:   Taxes and loans.

The subject of taxes is fixed by Art. IX, Sec. 3.

It is confined to property and a poll tax, and is required to be equal on all.

2. It is required to be sufficient for ordinary expenses.

3. It must be annual, and if one years' supply prove insufficient, it cannot be called for in the same year, but must be deferred to and included in the next year.

Then, as to the other source of supply, to wit, loans :

1. Their object must be to " defray extraordinary expenditures."

2. The power to make them is limited to two-thirds of the Legislature by yeas and nays.

3. The form of contract is prescribed.   It must be by bonds in certain amounts, with not over twenty years to run, registered and identified.

4. A tax must be levied to pay the annual interest.

5. Their final payment or redemption is left to fall into the class of extraordinary expenditures.

But, at the date of the Constitution there are, as already stated, debts of the State already existing; and these, too, when paid, would fall into the class of extraordinary expenditures.

But it may and probably would happen that whenever either of these two classes of debts become payable, the Legislature may not be able to do so, and, to meet that condition of things, Section 10 comes in and permits a substitution of other bonds, scrip, &c., for the other bonds or scrip which now call for redemption.

This exhausts the whole subject, and if the question be asked, can the State incur a new debt? the answer is that it can, if the Legislature comply with the above requisites.

1. As to the object, it must be to defray extraordinary expenditures.

2. It must be voted by two-thirds.

3. It must be in the form of registered bonds.

4. It must have a tax annexed to pay the annual interest.

Apply these requisites to the Revenue Bond Scrip, and not one will be found to have been complied with.

It necessarily follows that the scrip is void.

It cannot be authorized under the 10th Section, because it is not issued for the redemption of bonds or scrip already out and at maturity.

This disposes of the whole subject under the State Constitution.

And the result is that the Revenue Bond Scrip is declared illegal both by the Constitution of the United States and of the State.

2. The next proposition is that, being illegal, no obligation exists upon the State, or any of its citizens, to pay them, and no Court can assist to enforce that payment.

In fact, the scrip, being illegal, can furnish no consideration for any action, levy of taxes or judgment of a Court.—Story Const., § 159.

Every contract to do any act forbidden by law is void, and every act is illegal in itself which is expressly forbidden by State or common law, and the distinction between *malum in se* and *mala prohibita*, as to this point, no longer exists.

In Serg. Evans' note to Pothier on Obligations, page 1, the doctrine on this subject is thus summed up: " Whenever an engagement is entered into with a view to contravene the general policy

of the law, no form of expression can remove the substantial defect inherent in the nature of the transaction; the law will investigate the real object of the contracting parties, and if that is repugnant to the principles established for the general benefit of society it will vitiate the most regular instrument which ingenuity can contrive."

Mr. Fonblanqe, in his Treatise on Equity, B. 1, C. 4 and § 4, thus states the law : " It is indispensably necessary that we should have both a natural and moral power of performing what we undertake, for it would be absurd that an obligation, which derives its power from the law, should put us under a necessity of doing somewhat which the law prohibits."

Evans' Pothier, 2 vol., p. 7, thus states the law also as to secondary contracts : " That a participation in carrying the illegal purpose into effect vitiates every contract, whether primary or secondary, of which it constitutes the object, is a point upon which no difference of opinion can be entertained."

Cooley, 188, that when a Statute is adjudged unconstitutional, rights cannot be built upon it.

A contract to do what the law forbids cannot be enforced, whether it be *malum in se* or *malum prohibitum*. Thus, in *Bank United States* vs. *Owens*, 2 Peters, 527: "The charter of the U. S. Bank forbids the taking of more than six per cent. interest, but does not declare a contract to be void on which a larger interest has been taken. *Held*, that such contract is void upon general principles. Courts of justice are instructed to carry into effect the laws of a country, and they cannot become ancillary to the violation of those laws. There can be no civil rights where there can be no legal remedy, and there can be no legal remedy for that which is itself illegal."

A bill of exchange, drawn for the purpose of carrying on a business prohibited by Statute, is void in the hands of a holder with notice.—*Davidson* vs. *Lanier*, 4 Wall., 447.

Mr. Smith, in his Treatise on Contracts, (18,) says a contract not expressly prohibited by Statute is illegal, if opposed to the general policy and intent thereof, or if the contract be made to enable another to infringe that policy and intent.

If, says Lord Mansfield, (*Holmes* vs. *Johnson*, Cowp., 343,) the contract appears to arise from the transgression of a positive law of the country, then the Court says he had no right to be assisted.

An agreement entered into for the purpose of evading the provisions of a public Statute is void.—*Prole* vs. *Wiggins*, cited ——— 748.

Chitty on Con., 730, declares the test as to whether a demand, connected with an illegal transaction, is capable of being enforced at law, is, whether the plaintiff requires to rely on such transaction in order to establish his case; and he cites as authority a case in the House of Lords of *Fisher* vs. *Brydges*, where there had been an illegal agreement to convey land; the conveyance had been made, and afterwards, part of the purchase money being unpaid, the defendant made a new arrangement as to that; held that it could not be executed, being affected by the original trust.

So in Vermont, (*Buck* vs. *Arbee*, 26 Ver., 184), where a party placed goods in the hands of a broker to sell, and the broker sold in violation of the license law, the owner was not allowed to recover the money received.

*Sherman* vs. *Barnard*, 19 Barbour, 296.

The Act of the Legislature, set forth in the pleadings, having been pronounced unconstitutional, and contracts under it being void, the sale and transfer of such contracts does not constitute a good consideration for the promise to pay money.

2. The mere circumstance that the purchaser took the risk as to the validity of the Act of the Legislature, and of the contract, will not vary the law of the case.

3. The sale of an absolutely void chose in action will not form any consideration for a promise. If void, no legal obligation is created by it; and it is in the view of the law as if it did not exist.

4. The principle is the same, notwithstanding the chose is saleable in market for even the full value that would attach to it if valid. If the law dose not recognize it as having some binding force, and will not enforce it, a note given upon the sale of it will be invalid for want of consideration.

*Rodman* vs. *Munson*, 13 Barb., 188: The Act of July, 1858, is unconstitutional and void, and every debt or obligation contracted, or certificate issued under it, on behalf of the State, is also void and without binding force.

*Newell* vs. *People*, 7 New York, 1: Contracts in pursuance of an Act declared unconstitutional are void.

As to what provisions of a Statute may stand when others are

pronounced unconstitutional, Judge Cooley, at page 177, very clearly states the distinctions. He gathers the result of the decisions to be, that if a Statute attempts to accomplish two or more objects, and is void as to one, it still may be, in every respect, complete and valid as to the other ; but, if its purpose is to accomplish a single object only, and some of its provisions are void, the whole must fall, unless sufficient remains to effect the object without the aid of the invalid portion, and if they are so mutually connected with and dependent on each other, as conditions, considerations or compensations for each other, as to warrant the belief that the Legislature intended them as a whole, and if all could not be carried into effect, the Legislature would not pass the residue independently; then, if some parts are unconstitutional, all the provisions which are thus dependent, conditional or connected, must fall with them.

3. The certificates are in the nature of a contract ; that, as such, they must be sustained by a legal and sufficient consideration ; that the failure of such consideration, or a false representation of it, vitiates the contract as between the original parties and all subsequent parties with notice.

There can be no doubt that all these cases of State aid to corporations are contracts. The corporation undertakes all the duties expressed and implied in the charter, and these furnish the considerations for the undertaking of the State.

In the Act of 1868, the Blue Ridge Railroad Company undertook to build the Blue Ridge Railroad, and to enable them to do so the State undertook to guaranty the bonds of the company on condition that the bonds should not be used until the amount of three millions were obtained for them, or as much as was required for the road.

The State, in fact, became, as it were, an accommodation endorser on condition that the accommodation paper should not be disposed of under par.

And this condition was, in the view of the law, on the face of the paper—for the bonds always refer to the Act which authorize the issue and guaranty.

Under the circumstances, they could not be pledged at all for a less sum than par. Such a pledge would be a fraud upon the guarantor, and the party taking them could not hold them lawfully.

Therefore, when the surrender of State bonds back to the State is suggested as a consideration for the issue of the Revenue Bond Scrip, it is simply absurd.

The State was under no kind of obligation to pay them. On all that were in the possession of the Blue Ridge Railroad Company, she had a clear right to cancel her guaranty; and any that the Blue Ridge Railroad Company had put in pledge, contrary to the condition of the Act of 1868 were simply fraudulent and void.

As to the danger to the credit of the State, that furnishes no consideration, and the case of *Sherman* vs. *Bernard,* 19 Barbour, 291, cited above, expressly decides this.

But it is said that this clause of the Act of 1868 is repealed by the consolidation Act of 1871.

Suppose that to be true, for the sake of the argument, what would be its effect on the bonds.

It would leave them in the hands of the Blue Ridge Railroad, to be used for the purposes of the road.

For any *bona fide* purpose they might have pledged them, and the holder might claim the coupons on the bonds pledged, and if not paid by the Blue Ridge Railroad he could claim them of the guarantor.

But the bonds could not be claimed, and doubtless the State, on notice of the default, would fall back on her securities and protect herself.

And, in exchange for this liability, she gives $1,800,000, payable almost in cash.

What a monstrous fraud! Could it be sustained in any Court of justice?

But the condition never was repealed.

The Act for consolidating the Greenville and Blue Ridge Railroads was never carried out.

No conceivable consideration is offered to the State for the release of this condition and her securities, but the benefits proposed by the consolidation.

And the one having failed, the other falls with it.

The Act was intended as a scheme for such consolidation, and the main point failing, the whole Act falls.

It was, in fact, an amended charter, which was never accepted, and so the whole Act falls.

And as to the equity claimed for those who are said to have ad-

vanced money on the bonds, those parties have an adequate remedy against the President and Directors of the Blue Ridge Railroad Company, who transferred or pledged the bonds "*ultra vires.*"

Mr. Pope's argument:

It has been agreed by counsel in the argument that it should be divided so as to throw a portion of it upon each. The portion assigned to me will involve the questions arising under the Constitutions of the State and of the United States.

I. We announce, then, as our first proposition, that the Act of 1872, authorizing the emission of the Revenue Bond Scrip, is against the Constitution of the United States, and, therefore, null and void.

The clause of the Constitution is in these words: "No State shall * * * emit bills of credit."—10 Sec., I Art., Con. U. S.

1. In considering this clause, one of the first canons of construction is to arrive at the intention by the true meaning of the words, and the words must be taken in the sense in which they were used at the time. The *intention* must be drawn from the *words*, but the rule of evidence is to let in the light of surrounding circumstances. This rule may be gathered from the case of *Sturges* vs. *Crowningshield*, 4 Wheat., 202 ; *Fletcher* vs. *Peck*, 6 Cranch, 139.

If we go back to the Convention which framed the Constitution of the United States, we shall find the intention which actuated that body while using the inhibitory words, "No State shall emit bills of credit."

If we refer to the old articles of confederation, we shall find these words: "Congress *shall* have the power to borrow money *and* emit bills of credit of the United States." The report of a committee was made in the Convention of '89, in which was embodied a recommendation to incorporate the same power in the Constitution then under consideration.— *Vide* the Madison Papers, (2 vol., p. 1232,) and the letter of Luther Martin, (1 vol. Elliott's Debates, p. 381.)

Now, what was done by the Convention ? Mr. Curtis, in his History of the Constitution, (2 vol., p. 365,) says, referring to the Madison Papers : " Fears were entertained in the Convention that an absolute prohibition of paper money would excite the strenuous opposition of its partisans against the Constitution ; but it was thought best to *crush* it, and, accordingly, the votes of all the States, but two, were given to a proposition to prohibit absolutely the emission of bills of credit."

If the history gives us the contemporaneous spirit which actuated the framers of the Constitution, as to *withholding* this *grant* of power to Congress, we are prepared to understand the energy with which, in express terms, it *prohibited* this power to the States. For Congress to have the power, it must be granted; for the States *not* to have the power, it must be inhibited. Hence the Constitution as it now stands : the power not granted to the one and inhibited to the other.

2. The next question is : What was the character of the thing called a bill of credit, which the framers of the Constitution wished to *crush;* to emit which they would not *grant* to Congress and *prohibited* to the States ? Its character was well understood by Chief Justice Marshall, a contemporary of the Convention and of the Constitution.

When the Courts came to act upon this clause of the Constitution of the United States, two things were necessary : 1. It was necessary to discover the particular thing struck at and to be *crushed.* 2. Having discovered the thing, it became necessary in apt words to define the thing prohibited.

Some things were clear : The Constitution did not mean to include bills of exchange, bank bills of State banking corporations which had been long before, and were then, in circulation. All such were bills of credit, undoubtedly, in one sense ; but they were not *the* " bills of credit " embraced within the meaning of the inhibitory words.

The history of what was meant had to be resorted to, and the thing itself thus traced and identified. This was first authoritatively done by Chief Justice Marshall in the leading case of *Craig* vs. *Missouri,* (4 Peters, 437,) and by Mr. Justice Story, in his dissenting opinion, in the case of *Briscoe* vs. *the Bank of the Commonwealth of Kentucky,* (11 Peters, 332 to 337,) and by Mr. Justice McLean, in the same case, delivering the opinion of the majority of the Court. In this connection, I refer to the case of the *State* vs. *Billis,* (2 McCord, 14 ;) to the history of bills of credit, by Dr. Cooper, in his appendix to the Statutes at Large of South Carolina, (9 vol., p. 766 ;) and to Judge Story's Commentaries on the Constitution, (2 vol., § 1358.)

But, as we have said, the Court was obliged to *define* a bill of credit within the meaning of the Constitution. The first authoritative case was by the Supreme Court of the United States in the

case of *Craig* vs. *Missouri*, (already referred to.) In that case Chief Justice Marshall defined it to be as follows : " Bills of credit signify a paper medium intended to circulate between individuals and between government and individuals, for the ordinary purposes of society." The majority of the Court concurred in this definition. Three Justices—McLean, Thompson and Johnson— delivered separate opinions, each giving his own views upon a great question ; each endeavoring to give a definition more complete, as will appear by the case ; but none of which have ever been adopted as a rule.

The leading case of *Craig* vs. *Missouri* has never been overruled, although a portion of the definition of Chief Justice Marshall has been somewhat narrowed by subsequent decisions. The chief of these decisions may be found in the cases of *Briscoe* vs. *The Bank of Kentucky*, (11 Peters,) already referred to ; *Darrington* vs. *The State Bank of Alabama*, (13 Howard, p. 11 ;) and in several cases arising in State Courts, generally known as the cases of the Bank of Illinois, the Bank of Arkansas, and the State Bank of South Carolina, already referred to.

The points made in all these cases are made not to overrule the reasoning or conclusion reached in the leading case of *Craig* vs. *Missouri*, but are intended at once to confirm the ruling in that case, and to show that the later cases do not come within the principle of the leading case. But the great argument of Judge Story, in his dissenting opinion in the case of *Briscoe* vs. *The Bank of Kentucky*, in which he says that Chief Justice Marshall, then dead, had agreed with him, seems to overwhelm even the distinction taken in the latter class of cases. But the later cases are law. Let us, therefore, take the case of the Bank of the Commonwealth of Kentucky as our guide; and what are there declared to be bills of credit within the meaning of the Constitution ? 1. They must be bills issued *by* the State. 2. They must be issued upon the *credit* of the State. 3. They must be *intended* to *circulate* as *money*.

We are willing to rest this argument upon the definition of a bill of credit, recognized by a majority of the Court in the Kentucky case. By that case let us test the Revenue Bond Scrip, issued under the Act of 1872. The *name* is nothing. The Constitution is dealing with *things*, not *names*, as Chief Justice Marshall has well expressed it. 1. Is this bond scrip issued by the State ? I refer to several Sections of the Act of 1872. Is it issued on the *credit* of the State ?

Let the Act of 1872 answer this question. Is it *intended* to circulate as money? Again we refer to provisions of the Act of 1872. The *intention* must be drawn from the words and general provisions of the Act. To these we appeal. As to what is " circulation," is also a question of construction; and the test is given by Chief Justice Marshall, which has never been departed from, viz: that which passed between "government and individuals, and between individuals;" and as to what is "money," I do not know that it is possible to improve upon what has been said in the judgment of Mr. Justice Willard in the case *ex relatione* Gary. I consider that complete. The *form* of the bill, its *uses*, the mode of its being handled, the denominations of the bills, from one dollar upwards, are all there, and distinctly and ably set forth.

We have, then, in this case, all the elements present—the issue. by the State, on the credit of the State, with the *intention* that it should *circulate*, and that such circulation should be as *money*. At this point, it may be useful that the Court should compare the Missouri bill, which is called a "certificate," by the Missouri Act, and is set out in Craig's case, with the bond scrip, which is also called a "certificate," by the Act of 1872, a copy of which is in the possession of the Court.

. 3. The only remaining question under this general division of the argument is: Are these bills absolutely void? To say that they are unconstitutional is simply to say that the bond scrip is void for all purposes. An Act may be *void* in part under the Constitution, and good in part; but when the thing named in the Act itself has been declared unconstitutional, I do not understand how such thing can be separated into parts. The unconstitutionality *taints* it for all purposes.

Mr. Cooley, in his work on Constitutional Limitations, at page 180, says: " When a Statute is adjudged unconstitutional, it is as if it had never been." When the bond scrip itself is declared to be unconstitutional, it is the same as if it had never been. The case of *Craig* vs. *Missouri* is full to the same point; the " certificate" in that case was adjudged unconstitutional, and the bills, together with the contract founded upon them, were utterly set aside as unlawful; and the contract itself was declared to be a void contract. Mr. Sedgwick, in his work on the construction of Statutes and the Constitution, is full to the same point. I refer, also, generally, to the New York cases, cited and commented upon by the counsel who preceded me, (Mr. Haskell.)

In the petition, and in the argument, we have the words "State" and the "contract of the State," &c., used and repeated as if the "State" and the "Legislature" were, in fact, the same thing; whereas the very point we make is that the "Legislature" is *not* the "State;" and that the "State" cannot be bound by an unconstitutional Act of the "Legislature."

If the Act be unconstitutional, it is *no law;* and that which is no law cannot bind the State, nor can it support any contract. But strangely enough it has been seriously argued that the bond scrip may be unconstitutional, and yet that it may be good as a *contract,* and as such it should be received for taxes, because the State may direct in what the public dues may be paid. Direct *what* to be received? That which has no existence? We have heard the case of *Woodruff* vs. *Trapnell,* (10 Howard, 308,) given as authority. It is true, in that case it was held that the bills of a certain corporation (bank bills) should be received for the taxes of the State, according to a previous Act of the Legislature; but it was first held that these bills were unconstitutional; that this being so, the Act was a *contract,* and that the subsequent Act repealing the provisions of the first Act was unconstitutional. A reference to the case will show that it is an authority in our favor on this point; and very much in our favor on another point hereafter.

II. Our next proposition is that the Act of 1872 (called the Bond Scrip Act) is in violation of the Constitution of the State of South Carolina.

1. This aspect of the case has been very fully presented (by Mr. Haskell;) but as it is so important, we shall enter upon it again.

To understand how this constitutional argument applies, it will be necessary to discuss, as a preliminary, some of the principles of the State Constitution of 1868.

One of the chief of these is that the Legislature is a body possessed of limited powers, well marked out by the Constitution itself. It is not a British Parliament, nor is it a Legislature sitting under the Constitution of 1790.

We refer to Article I, Section 41, of the State Constitution. These are the words: "The enumeration of rights in this Constitution shall not be construed to impair or deny others retained by the people, and all powers not herein delegated remain with the people."

Whatever may be the construction of the word "delegated," as a general restriction upon legislative powers, we know that the Legis-

lature, under the Constitution of 1868, is most particularly limited and circumscribed in its power to contract debt, levy taxes, or bind the State. Its power here runs within narrow limits. It can no more go beyond those powers as marked out to it than a Court can go beyond its jurisdiction.

Now, what are these powers? How have they been limited? beyond which limitations the Legislature may not go? What powers of taxation? What powers to contract debt? What powers to issue evidences of debt? I refer generally to Article IX of the State Constitution.

In discussing these questions, the Court will find these powers narrowly defined. They are first divided by the Constitution into two general classes:

1. The power to provide for ordinary expenses: Art. IX of the State Constitution, Secs. 3 and 4.

2. The power to provide for extraordinary expenses: Art. IX of the same Constitution, Sec. 7.

These embrace everything that could be necessary as a mere grant of power. All expenditures must be either ordinary or extraordinary. But underlying these are two other classes of power necessary to carry out the first two:

1. The power to levy taxes for ordinary expenses and such deficits as may occur.

2. The power to borrow money to defray extraordinary expenses.

These exhaust all of the powers, primary and secondary, under the 9th Article of the Constitution of the State.

But how shall these powers be exercised? The Constitution does not seem to have contemplated any great danger from taxation as such. The vote of the constituency was supposed to furnish a sufficient check upon the Legislature. Taxation is, therefore, limited in two respects only: 1. There thall be an estimate of the expenses, and the tax should be levied only to meet such expenses. 2. The tax shall be laid for a single object; that object shall be expressed in the Act, and the tax shall be applied to the object named.

But when the Constitution is dealing with the power to borrow money, then it puts limitation upon limitation. Great danger was apprehended here, and with reason.

1. It is directed that the cause of the extraordinary expenditure shall be pointed out.

2. That the Act to become a law shall be passed by a two-thirds vote.

3. That a tax should be at once levied to keep down the interest.

All this appears in 7th Section of the 9th Article of the Constitution.

The next thing looked to by the Constitution was to the *shape* which the debt so contracted should assume. This is pointed out in 14th Section of the same Article. It shall be by bonds and bonds only; not by stock, not by scrip, but by bonds; and these bonds shall not be under a certain sum named, and shall not run longer than twenty years. Each bond shall be numbered and registered, and the *name of the party* to whom the bond is made payable shall be recorded. (*Vide* 14th Sec., 9th Art., Con. S. C.) The Constitution of 1868 intends that the bonds of the State shall not be hawked about in the stock market.

The next thing the Constitution looks to is, how the debt thus created and represented by bonds shall be redeemed. This is pointed out in the 10th Section of the same Article, where two things are provided for :

1. The old debts of the State, due before the adoption of the Constitution of 1868. 2. The debts expressly authorized in that Constitution, then under consideration. For the first, scrip may be issued to redeem them; and for the second, scrip also, when the debts created and in the shape of bonds, according to the Constitution, shall become due. If the State finds itself, at the day, not in funds to pay the bonds, and if the holders of the due bonds will not take *new* bonds issued as for a *new* debt, to replace the due bonds, then scrip may issue to redeem such due bonds.

In no other way can South Carolina now contract a debt, and no scrip can be issued except to redeem such a constitutionally *created* debt by bond. The 9th Article of the Constitution is intended to lead to this very result, viz : To make it difficult for the Legislature to involve the State in debt. Give us this ninth Article of the Constitution of South Carolina in its purity, and we could ask no more. It is absolutely perfect, if enforced, to prevent extravagance and fraud.

Now, was the bond scrip ever a *bond* created under the limitations of the 7th and 14th Sections of the 9th Article of the Constitution ? This will not be even pretended.

Having shown how only a debt can be created, our next duty is to show that no such debt ever existed; and more than that, no debt of any kind ever existed ; and more than that, no liability ever

existed; and more than that, no *contingent* liability ever existed on the part of the State. We propose to show that there never was a debt due by the State, at any time, upon which to bottom this Revenue Bond Scrip, *authorized* (as it is said) by the Act of 7th March, 1872.

This involves some reference to the legislation touching the Blue Ridge Railroad:

1. We will commence with the Act of 1868. (*Vide* Act of that year, 15th September, page 25, Sections 1, 2 and 4.) That Act contained an express condition that the guaranty by the State of the bonds, and the bonds themselves, should be issued only in case the Congress of the United States or private capitalists should let the road have $3,000,000 for $3,000,000 worth of bonds, or a less sum at the same rate; in other words, every dollar of bonds was to secure and bring in a dollar of money. (*Vide* the proviso in the Act.) This was a public Act, and this condition went out with the bonds. Trapnel's case is authority on this point.

This Act, we say, created no debt by the State. There was not even a contingent liability until dollar for dollar was realized upon the bonds. Even then there would be no "*debt*" of the State; and, for the first time, the transaction would assume the shape of conditional liability. The Legislature did not regard the Act of 1868 as creating any debt, because they provided no tax to meet the interest, as they were compelled to do, if the Act created a debt. (*Vide* Section 7, Article IX, Constitution 1868.)

The bonds were prepared, and the State endorsed them. They were useless. The State was a guarantor upon condition. The company could not get one dollar of money for one dollar of bonds. With this condition unperformed, the State could at any time have withdrawn its conditional accommodation guaranty. When, therefore, the Act of 1872 was proposed to the Legislature, the only place in which these bonds could lawfully and honestly have been was under lock and key, in the iron safe of the Blue Ridge Railroad Company. To hypothecate them, even, would be a *fraud* upon the State, and an unlawful use of her guaranty.

But it is said that the State has repealed this important condition, found in the Act of 1868. When, where, and how? We are re. ferred to the 6th Section of the Act of 1871.

Now, does this 6th Section repeal the "express proviso" of the Act of 1868? We answer, no—

1. Because the 6th Section of the Act of 1871 is in direct violation of the 20th Section of Article II of the Constitution of 1868, viz: " Every Act or Resolution having the force of law shall relate to but one subject, and that shall be expressed in the title."

2. Because all of the provisions of the Act of 1871 are made to depend upon the consolidation of the Greenville and Columbia Railroad and the Blue Ridge Railroad into one road, with a new corporate name, which has not been done.

3. Because the consolidated road is required to endorse the bonds of the two old roads, respectively, which it is admitted has not been done.—(*Vide* Sec. 7, Act of 1871.)

4. Because the Act of 1871 was but a charter conferred or offered by one contracting party and not accepted by the other, which rendered the whole Act inoperative and void.

This last ground appears upon my notes of argument as a most important point, but by some means it escaped me while actually addressing the Court, and as it was most ably used by my friend (Mr. Memminger) in his concluding argument, I shall add nothing further upon that point.

The third ground above stated will fully appear by the words of the Section of the Act referred to, and need not be enlarged upon in these notes required by the Court. The line of argument can, I doubt not, be readily recalled.

The second ground was elaborated in the argument before the Court very much, in reply to the views suggested by the counsel who opened the argument, (Mr. Chamberlain.) The words of the Act furnish the key to the reply. They can mean but one thing. The whole Act does but set out the terms of a contract. The consolidation was to be the consideration of the roads. With the non-performance of that consideration the contract fell, and the whole Act became a nullity. If, therefore, the 6th Section of the Act of '71 had, in law, repealed the previous condition in the Act of '68, still the Act of '71 enacted a new condition, to wit: consolidation, which condition precedent has never been complied with.

The first ground turns upon the construction of the words of the Constitution as cited. The same words appear in the Constitutions of many of the States; and in the Constitution of the State of New York are found the same words, except that in that State they are confined to local or private bills. The words have received judicial interpretation. The two leading principles of these cases are: 1.

That the construction must be rigid and precise, to give them the value intended by the framers of the Constitution. 2. That words cannot be interpolated, but effect must be given to the clause as framed in the instrument.

The construction contended for by us is fortified by the following authorities, all agreeing, except one authority from California, which I have not been able to examine: *The People* vs. *McCann*, (N. Y.;) *The Town of Fishkill* vs. *The Fishkill and Beekman Plank Road Company*, (a leading case in New York, decided in 1856;) *Smith* vs. *The Mayor of New York*, (decided in 1868,) 34 Howard, P. R., 508; *Williams* vs. *The People*, 24 N. Y., 405; *The Mayor of New York* vs. *Colgate*, 2 Kernan, 146; *The Sun Mutual Insurance Company* vs. *The Mayor of New York*. I refer also to 4 Hill, N. Y. R., 418, for its general reasoning. The Court may also be aided by the case of *Baldwin* vs. *The Mayor of New York*, in 1864, by the Supreme Court of that State.

In conclusion, we come to the most extraordinary argument of all, viz: That, under the Act of 1872, this Court may hold the bond scrip to be unconstitutional, and yet compel the Comptroller, by a *mandamus*, to levy the tax to redeem it. Under any law, to levy a tax to redeem that which does not exist would be an absurdity. But with one hand to strike the object out of the Act, and with the other to enforce that which has no meaning without the object, seems to be more absurd, if possible. The 4th Section of the IXth Article of the State Constitution, apart from general reasoning, sets that matter at rest. It directs that any Act laying a tax shall state the object of the tax, and that it shall contain no other object; that the tax levied shall be applied to that object, and to no other object. And yet it is gravely asked to strike the bond scrip (the only object) out of the Act of 1872, and still to levy the tax. The preamble to the Act (which is no part of the Act) we have shown to be false in fact and wholly unfounded in law. This Court cannot be deceived by false recitals, introduced to cover public robbery by the forms of law.

Other points of the argument will be discussed by counsel who are to follow me.

Mr. Haskell's argument:

We have agreed rather to divide the argument, so that I shall devote most of my attention to the Act of 1872, page 79, with reference to the Constitution of the State of South Carolina.

1. That the Act authorizing the issue of the Revenue Bond Scrip is in violation of the Constitution of the State of South Carolina; and, therefore, that the emission of the said scrip by the State Treasurer is contrary to law, and the scrip a nullity.

 . *a.* That the Legislature is not the State, nor has it the sovereign authority, but it is vested with only one branch of the sovereign power; and in wielding it, it is hedged in by important limitations, some of which are imposed in express terms, and others by implications, which are imperative.

And that, in passing the Act (p. 79, 1872,) which is now under discussion, the Legislature has done that which it has been forbidden to do.

What power does vest in the Legislature ? Cooley on Con. Lim., p. 88, Ch. J. Denio ; Cooley, p. 437 on Agents, p. 217–219; Con. Limit on Power to Incur State Debt; Sedgwick, p. 160–175, 414, 554.

" Plenary power then in the Legislature for all purposes of civil government being the rule," the specific and positive direction of the Constitution, on any particular subject, contains an implication against everything contrary to it, or which would frustrate or disappoint the purpose of that provision.

And further is the declaration of the law itself, and deprives the Legislature of all power in the matter, except within the limits of the constitutional provisions. For " where the means for the exercise of a granted power are given, no other or different means can be implied as being more effective or convenient."—Cooley, 64, Ch. J. Marshall.

" All powers, therefore, on finance and taxation ' not herein delegated, remain with the people.' "—*Vide* Con., 1868, p. 6, Art. I, §341; Art. IX, p. 29.

Is this Act then—the Blue Ridge Bond Scrip Act, p. 79, 1872— in accordance with the requirements and within the limitations of the State Constitution ? Is it not in direct violation, and has it not trampled upon the restrictions of the Constitution ?

The Constitution divides the expenses and the expenditures of the State into two classes : "Ordinary" and " extraordinary."—Art. 9, p. 20.

The former, § 3, being the annual expenses of conduct and maintenance of the State Government.

The second, or extraordinary expenditures, is *provided* for and *restricted* as follows :

" For the purpose of defraying extraordinary expenditures the State may contract public debts; but such debts shall be authorized by law for some single object, to be distinctly specified therein; and no such law shall take effect until it shall have been passed by the vote of two-thirds of the members of each branch of the General Assembly, to be recorded by yeas and nays on the journals of each House, respectively; and every such law shall levy a tax annually, sufficient to pay the annual interest of such debt."—Con., p. 21, Art. IX, § 7.

SEC. 10. " No scrip, certificate, or other evidence of State indebtedness shall be issued, except for the redemption of stock, bonds or other evidences of indebtedness previously issued, or for such debts as are expressly authorized in this Constitution."

SEC. 14, p. 22. " Any debt contracted by the State shall be by loan on State bonds, of amounts not less than fifty dollars each, on interest payable within twenty years after the final passage of the law authorizing such debt. A correct registry of all such bonds shall be kept by the Treasurer in numerical order, so as always to exhibit the number and amount unpaid, and to whom severally made payable."

Do these " Treasury Certificates of Indebtedness (styled Revenue Bond Scrip)" come within the restrictions or comply with the requirements above set forth? If they do not, I respectfully submit that they are unconstitutional.

One of the counsel for the appellants has, in the Court below, answered the argument which I am now about to submit as follows:

" To our mind, the Constitution expressly warrants and provides for such issue as the present.

" Section 10 of Article IX is as follows:

" No scrip, certificate, or other evidence of indebtedness, shall be issued, except for the redemption of stock, bonds, or other evidences of indebtedness previously issued, or for such debts as are expressly authorized by this Constitution.

" It appears to us too clear for serious argument that this is an express authorization of the issue of scrip, certificates, or other evidence of indebtedness for the purpose of redeeming stock, bonds, or other evidence of indebtedness previously issued.

" Assuming then—what seems undeniable—that this scrip was issued to redeem a previously issued evidence of indebtedness, it is expressly authorized by the Section now quoted."

Grant all his premises, and probably the conclusion will hold good, for he assumes as undeniable all that we have attempted to deny.

But we will take one point in his premises, viz: That the issue of the scrip must, to be legal, come under Section 10 of Article IX.

Under this Section 10, scrip or certificates can be issued for only two purposes:

1. " For the redemption of stock, bonds, or other evidences of indebtedness, *previously issued.*"

2. " Or for such debts as are expressly authorized in this Constitution."

*a.* The words " previously issued," in the first division, refer to and qualify the whole of the preceding portion of the sentence, and refer to the past liabilities of the State, as contra-distinguished from the future liabilities which are provided for by Sections 7 and 14 of Article IX ; and in the second division of this Section, can only refer to the words " other evidences of indebtedness," and can have but two constructions: the meaning of one being, evidences of indebtedness issued previous to the adoption of ·this Constitution ; of the other, evidences of indebtedness previously issued for the redemption of " stock " or " bonds."

*b.* The words in the second division of Section 10 speak for themselves, and cannot be forced to mean any debt other than such as is provided for in Section 7, above quoted, and perhaps the annual expenses as provided for in Section 3 of the same Article.

There is no claim made that the Blue Ridge Scrip was raised to *redeem* " stock " or " bonds," or "*for* such debts as are expressly authorized in this Constitution ;" but it is claimed by the appellants that the scrip was issued " for the redemption * * * of other evidences of indebtedness previously issued."

What proof do they set up? What does the Act say? " An Act to relieve the State of South Carolina of all liability for its guaranty of the bonds of the Blue Ridge Railroad Company, by providing for the securing and destruction of the same."

The body of the Act does not mention a single bond of the Blue Ridge Railroad Company for which the State is liable, and, therefore, does not accord with the subject set forth in the title.

The Act does not pretend that its object is to *redeem* any " stock,

bonds, or other evidences of indebtedness previously issued," but in fact directs the Treasurer to issue the scrip on the delivery of certain Blue Ridge Railroad bonds, to the amount of $4,000,000, endorsed by the Comptroller General of the State. It is admitted that the said bonds had not yet become due ; and it has not been contended that a guarantee of a bond not yet due can be other than a mere contingent liability—not yet a debt. It cannot therefore be called " evidence of indebtedness."

The statement of the facts is very simple, and yet startling. The Legislature has directed the Comptroller General to endorse, in the name of the State, $4,000,000 bonds of the B. R. R. R. Co. This having been done, the Legislature, or the Financial Board, lends to the B. R. R. R. Co. $220,000 in money and take a collateral security, $600,000 of said bonds. The B. R. R. R. Co. holds the balance of the bonds. None of these bonds are yet near due—the members of the Financial Board or their Agent hold a large part as security for the State loan, and the State has a lien on the property of the company. The Legislature then, at this stage, proceeds to release the B. R. R. R. Co. from liability for $220,000 ; releases it from the lien held by the State, and pays to the B. R. R. R. Co. $1,800,000 in what these appellants are trying to make as good as money ; to be let off from a liability, contingent and remote in any event, and notoriously fictitious under the view taken of it at the time this was Act passed. Those bonds could not be sold; they were worth nothing in the market; and had not been sold by the B. R. R. R. Co.; and if any besides the $600,000 held by the State Financial Board were deposited as collateral, the debt they were used to secure did not exceed $300,000.

These bonds cannot be called a State debt. The certificates cannot be issued except to redeem a standing acknowledgment of indebtedness. None such is shown. And the Act is clearly contrary to the State Constitution, Art. IX, Sec. 10.

2. Again, can it be said that the scrip has been or can be issued under this Act "*for* such debts as are expressly authorized in this Constitution."

Does such debt exist ? We have striven to make it apparent to the Court that no debt yet exists against the State on these bonds. The Legislature is not the State, and cannot by its simple assertion cram any debt it pleases on the State. If it designs contracting a debt in the name of the State, that must be done which the State

commands to be done before her faith shall stand pledged. If the State has become liable on the bonds, the Legislature must, under Section 7, Art. IX, raise money to meet this liability ; and that can only be done by compliance with the requirements of Sections 7 and 14 of Art. IX, which it is not pretended has been done in this case.

If the Legislature can, under the Constitution of 1868, lend the name and credit of the State, Section 7, Art. IX, plainly and explicitly directs the manner in which the liability of the State can be met, and forbids any other.

We submit, therefore—

That this scrip is issued neither "for the redemption of stock, bonds, or other evidences of indebtedness previously issued," nor " for such debts as are expressly authorized in this Constitution."

In the next view we submit the legality of these bonds themselves will be considered.

What position do they hold? Have they been issued ? And if so, has it been legally done?

If the bonds have gone out of the hands of the R. R. Co. illegally, with conditions unperformed, the guarantor cannot be held liable, and the issue of scrip to redeem a nullity is manifestly unconstitutional. The bonds come into existence under the Act of 1868, p. 25, "An Act to authorize additional aid to the Blue Ridge Railroad Company in South Carolina," §2. The terms of this Act, if the Legislature has the right to guarantee any bonds, are more in the spirit of the Constitution ; the leading point in the Act being that the bonds shall not be used until their par value be given in exchange for them. The State then would be liable only for the actual amount of money borrowed on its credit, as directed in §14, Art. IX.

The next Act affecting the bonds is entitled " An Act to promote the consolidation of the Greenville and Columbia Railroad Company, and the Blue Ridge Railroad Company," 1871, page 590.

§ 1 amends the Act of 1853.

§ 2 amends the Act of 1845.

§ 3—1. G. & C. R. R. may extend their line to Knoxville; 2. May build a branch to Aiken ; 3. May build a branch to Washington, Georgia ; 4. May build a branch to the North Carolina line.

§ 4. In view of consolidation—1. Bonds of B. R. R. R., 1868,

and endorsement confirmed. 2. Mortgage to Henry Clews, *et al.*, made prior.

§ 5. Treats of G. & C. R. R. bonds, and designates the rank of liens with regard to such bonds.

§ 6. *Repeals* Section 2 of Act of December 1868, p. 25.

§ 7. After consolidation, the bonds of each road shall be endorsed by the two.

§ 8. On failure to pay bonds, Comptroller General takes possession of the road.

§ 9. Act of incorporation.

§ 10. " That all Acts or parts of Acts inconsistent with this Act, or any part thereof, *are for the purposes of this Act, but for no other purpose,* hereby amended, modified or repealed, as the case may require, so as to *conform to the true intent and meaning* of this Act.

We will consider hereafter the question of the title of this Act; for the present we will examine its conditions.

1. The title expresses the purpose of the Act.—Section 10, Art. II, Cons., p. 9. " Every Act or resolution, having the force of law, shall relate to but one subject, and that shall be expressed in the title."

2. Section 4 states the essential condition on which all the other Sections pend.

3. And Section 10 reiterates the condition essential to the repeal of any other laws, and confines the Act to the purpose and intent expressed in the title.

\*       \*       \*       \*       \*       \*       \*       \*

It is admitted, at the hearing of the Court below, that the two railroad companies have not consolidated themselves together, nor taken any measures to effect that end. We submit to the Court that where so many auxiliaries are compiled in one Act to promote one great general purpose set forth in the title, it would be monstrous to allow each, any or all of the said professedly auxiliary provisions to be executed to a distinct end, while the general purpose, for which they were all enacted, has been entirely neglected, is still so, and has been actually prevented by the very people who procured the passage of the Act, and have availed themselves of its subordinate provisions. Can the Act of 1868, p. 25, be considered as repealed? Can the guaranteed bonds be issued except as provided by the Act of 1868? And if they cannot, as the Court below has decided, and as we feel strong assurance that this Court

will sustain, the bonds are still, in law, in the hands of the Blue Ridge Railroad Company, and the State is not liable. We repeat, that the Act of 1870 can only stand as an Act to promote the consolidation of the two railroad companies, and that the privileges, therein declared, cannot be enjoyed until the purpose for which they were promised has been accomplished. For, without such a tie to hold them together, each Section of the said Act would stand forth as an enactment in itself distinct from each of the others; and there would be ten subjects in one Act, or ten distinct Acts, and of them no one could be of force except the one expressed in the title, if such there be.

We have thus far endeavored to show:

1. That if the Legislature can, under the Constitution, give the aid of the State to enterprises and improvements, it can only do so by raising money as is directed in the Constitution in Sections 7 and 14 of Art. IX.—*Rodman* vs. *Munson*, 13 Barb., pp. 63, 188; *Sherman* vs. *Barnan*, 19 Barbour, p. 291; *Newell* vs. *The People*, 3 Selden, pp. 9, 139.

2. That a guarantee is not a debt until the instrument guaranteed has fallen due, and the principal has failed to pay. And that these events not having occurred, the State is in no manner liable for the $4,000,000, even if the guarantee be constitutional, and that the Act of 1872 is premature.

3. That should the moral obligation ever arrive, the Legislature can meet it in no other way than by appropriation, as provided in Section 7, and the issue of bonds, under Section 14, to raise the money.

4. That no scrip, certificate or other evidence of indebtedness can be issued by the Legislature, or the officers of the government, in the name of the State, except for *stock*, bonds, or other evidences of indebtedness held against the State at the time of the adoption of the Constitution, or arising subsequently under §§ 3, 7 and 14 of Art. IX.

5. That the said $4,000,000 bonds, whether due or not, do not come under any of the above classifications, and that the Legislature is, by Section 10, Art. IX, forbidden to issue the scrip, whether it be called for the redemption of the $4,000,000 bonds, or to prevent a contingent liability.

6. That the intention of the Constitution, when not positively inconsistent with the words thereof, is the law by which this Court

will decide.   Much stronger is it when the language and the inten-tion are consistent, as in Sec. 14, Art. IX.

"Any debt contracted by the State *shall be by loan* on State bonds, of amounts not less than fifty dollars each."

That the meaning of this is, that the State shall raise money by borrowing it, and shall give for the said money its bond for the amount, dollar for dollar; and that the idea that the Legislature can issue ten millions of bonds to raise one million of dollars, or to be sold at low rates, disgraceful to the credit of the State, is mon-strous, and we feel confident, will not be sustained by the judicial department of the government.   That the Act of 1868, authorizing the guarantee of these $4,000,000 bonds, recognized at least to this extent, the mandate of the supreme authority, and insisted upon the essential condition, that if these bonds went out on the credit of the State, they should go for their full value, and that the State, if it ever paid them, should pay only for actual money in the amount received.

And that consequently any Act, such as the Act of 1870–71, page 590, which undertook to repeal this essential condition, is, in that, unconstitutional, null and void, and that if these bonds went into market by sale, or as collateral securities, under any terms or conditions other than that contained in the Act of 1868, the guar-antor was, thereby, positively discharged, and the guaranty no longer exists.   And such is the case, as reference to the brief will show.

In conclusion, we respectfully submit that the Act of 1872, page 590, and the Acts of 1872, page 80, are unconstitutional, null and void, in and as to all clauses and parts thereof which do not come under and within the scope of their respective titles, in accordance with Sec. 20, Art. II, p. 9 of the Constitution.

" Every Act or Resolution, having the force of law, shall relate to but one subject, and that shall be expressed in the title."   We refer to Cooley on Con. Lim., pp. 80, 81, 84; Sedgwick on Con. and Stat., p. 567, and their treatment of the subject.

The decision, almost without exception, sustaining the mandatory character of the constitutional provisions, and making " the title to control, and exclude everything from effect and operation as law, which is incorporated in the body of the Act, but is not within the purpose indicated by the title."—Cooley, p. 141.

If, then, the Act of 1871, p. 590, or the Act of 1872, p. 80, be

held to be unconstitutional, the prayer of our complaint must stand, and the petition of the holders of the scrip must fall, for the last Section of the Tax Act of 1872, p. 276, so far as it directs that the Revenue Bond Scrip be taken for taxes, is a nullity.

" When a Statute is adjudged to be unconstitutional, it is as if it had never been. Rights cannot be built up under it; contracts which depend upon it for their consideration are void; it constitutes a protection to no one who has acted under it, and no one can be punished for having refused obedience to it before the decision was made. And what is true of an Act void *in toto* is true also of any part of an Act which is found to be regarded as having never, at any time, been possessed of any legal force."—1 *Strong* vs. *Daniel*, 4 Ind., 348; *Astrom* vs. *Hammond*, 3 McLean, 107.

April 18, 1873. The opinion of the Court was delivered by

Moses, C. J. The relators, by their petition, seek a writ of *mandamus* to compel the Comptroller General of the State to levy, and to cause to be levied, the tax for the redemption of the treasury certificates (styled "Revenue Bond Scrip") held by them, as provided by the fourth Section of the Act of March 2, 1872, (15 Stat., 79,) entitled "An Act to relieve the State of South Carolina of all liability for its guaranty of the bonds of the Blue Ridge Railroad Company, by providing for the securing and destruction of the same." The four first Sections are set out in the petition; as the fifth has an important bearing on the points made by the return, it may be proper to insert it here. It is in the following words: "That if any such Revenue Bond Scrip is received in the treasury for the payment of taxes, the Treasurer be, and he is hereby, authorized to pay out such Revenue Bond Scrip in satisfaction of any claims against the treasury, except for interest that may be due on the public debt."

Various causes are alleged in the return of the respondents, of which we propose to confine our consideration but to two. These apply substantially to the merits involved, and are regarded by the Court as objections which must preclude the issuing of the writ. Whether it is to be viewed as a prerogative writ, not demandable of right, or at the present day as an ordinary process in an action between parties, it will be refused, if it is manifest that it must be " vain and fruitless " or " useless," (Tapping, 15.) Nor should it be granted " if it will introduce confusion and disorder," or " where it

is manifestly improper," (*Ibid*, 16.) The cases referred to sustain the propositions, which recommend themselves to adoption by the common sense which is intimated in their very expression. The judgments of Courts are intended to have effect by accomplishing the purposes which are proposed by the remedies through which they are attained. If they cannot have complete operation by not only enforcing the act which they command, but of making it productive of the benefit which they propose, they fail in the very capacity or ability which, to give value to judicial orders, must attach.

The object of the application is to cause a levy of the tax for the redemption of the treasury certificates (styled Revenue Bond Scrip) held by the petitioners, and if the suit would be unavailing to this end, or its execution introduce confusion or disorder, it should not be granted.

The respondent, among the causes enumerated in his return against the motion, submits : " That, under proceedings duly had in the Courts of this State, the said Act of March 2, 1872, has been declared null and void, and the said certificates mentioned in the petition have been declared illegal, and the various officers of the State, in the treasury department thereof, have been enjoined from receiving or issuing the same ; that such proceedings are still pending, and it would have been, and is now, unlawful for this respondent to take the action prayed for in the petition." To which the relators reply : " That the said proceedings therein referred to, by which the said scrip has been declared null and void, do not have for their object to prevent the levy of the tax demanded by these relators, and that no decision can be rendered in said proceedings which will reach the subject matter or object which the petition herein of these relators embraces."

The object of the said proceedings was to enjoin the State and County Treasurers from receiving the said scrip for past due taxes, and for the taxes thereafter to be collected, and from paying out the same, and the Court so accordingly ordered. The judgment, which stands in full force, and, until reversed, should be accepted as the law by which the State and County officers connected with the levy and collection of the taxes must be governed, holds the emission of the scrip void for its repugnance both to the Constitution of the State and that of the United States. It is attempted to avoid the effect of the said judgment by insisting that the claim

now made is for a levy of the tax for the redemption of the scrip, thus seeking entirely to ignore so much of the third Section of the Act as makes " the scrip receivable in payment of taxes and all other dues to the State, except special tax levied to pay interest on the public debt," and the whole of the fifth Section, which authorizes " the payment of the scrip so received for taxes in satisfaction of any claims against the treasury, except for interest that may be due on the public debt."

To authorize the collection of the tax for the redemption of the particular portion held by these relators would be at variance with the mode provided by the Act for the redemption of the Revenue Scrip to the amount of $1,800,000, or such amount as shall be proportioned to the amount of bonds delivered. That contemplated its reception into the treasury for taxes and other debts, and its payment for claims against the treasury, and the aid of its employment in carrying on the State finances for at least four years, for it was not until the end of each year from their date that a fourth part of the certificates was to be retired. It looked to an annual tax for its redemption, thus having regard to the whole amount to be issued, and to the retirement annually of the one-fourth. The retirement of one-fourth *per annum* might have been effected by the retention of that amount annually in the treasury, if so much should be received in one year. It proposed no preference among the scrip holders, nor was any advantage to any particular class intended. The relators allege in their petition " that, on the surrender of the bonds, the State Treasurer did deliver to the President of the Blue Ridge Railroad Company, in South Carolina, Treasury Certificates of Indebtedness (styled Revenue Bond Scrip) to the amount of one million seven hundred and ninety-six thousand eight hundred and twenty-three and fifty-three one-hundreths dollars." What particular privilege can these relators claim, to have their scrip retired even before the end of the year, and before any opportunity has been afforded to other holders on the same footing with them to come in and participate? These views apply to the case, made by the relators as against this respondent, entirely unaffected by the judgment of the Court already referred to, declaring the scrip unconstitutional and therefore void. Viewed, however, in connection with that judgment, how can the Comptroller General, a sworn officer of the State, direct the levy of a tax for the redemption of an obligation declared by a Court of competent jurisdiction to be illegal?

That the Treasurer and not the Comptroller was the party to the cause can make no difference. The judgment acted upon the scrip, which was pronounced "wholly unauthorized, illegal, and without value for any purpose whatever," and the Treasurers were enjoined "from receiving it for taxes for any debt or obligation due the State, and from paying it to and for any liability of the State."

If the scrip was illegal, it can furnish no consideration for any action, levy of taxes or judgment of a Court.—Story on Const., Sec. —. But suppose the Comptroller General had ordered the levy of the tax for the purpose prayed by these relators. While his act might have caused great hardship and suffering to the people by exacting another in addition to the annual tax, and surely prejudiced the monetary condition of the State, as to these relators, it would have been but a mere ceremony without avail of benefit to them, for the State and County Treasurers were all parties to the proceeding which declared the scrip illegal and void. In the face of that judgment could the Treasurer have ventured its redemption? Was it not forbidden, if not in express terms, by an implication too plain and clear for resistance or even doubt? Was it not to be made through the money which was to be raised by the levy? The writ is, therefore, claimed, where, in the language of Mr. Tapping, "it would be vain and fruitless, and without any beneficial effect."

But the respondent, not only insisting on the cause heretofore noticed, submits "that the said Act is null and void, in that it is repugnant to the Constitution of the United States, which ordains that 'no State shall emit bills of credit, or make anything but gold and silver coin a tender in payment of debts.'" A careful consideration, induced by the large pecuniary interests involved in the question, together with the fact that provisions both of the State and United States Constitutions have been brought into its discussion, has satisfied us that the Act, so far as it authorizes the emission of Revenue Scrip, is in violation of the clause of the Constitution of the United States already referred to. The argument which holds it valid as a subsisting obligation, and repels the character of a bill of credit, under which it is classed by the respondent, seems to rest upon the fact that it was not designed to circulate as money. The opinion of Mr. Justice Willard in the *State ex rel. Gary* vs. *Parker*, Treasurer, and *Dupre* vs. *County Treasurers*, which was brought to our notice in the case before us, and which will be re-

ported with it, (a) is so full and comprehensive on the point as to leave little space for addition or enlargement. It is not because the paper circulates from hand to hand in a community like money that it is to be held a bill of credit, nor does the fact of currency so constitute it. A State might well make the coupons attached to its bonds receivable for taxes without subjecting them to the disabilities of bills of credit as used in the Constitution, even although they might readily pass in payment of debts or for the purchase of commodities. The design to create a circulating medium would be wanting. If, however, the intention to create a currency is apparent from the whole scope of the Act, the emission is a bill of credit

(a) The opinion of Mr. Justice Willard, to which reference is here made, is as follows:

This motion comes before me under Section 241 of the Code, authorizing a Justice of the Supreme Court to entertain a motion for an injunction in case of the absence of the Circuit Judge from his Circuit, or his inability from any cause.

The question involved is, whether an Act of the Legislature entitled "An Act to relieve the State of South Carolina of all liability for its guarantee of the bonds of the Blue Ridge Railroad Company, by providing for the securing and destruction of the same," passed March 2nd, 1872, 15 Stat., 79, is unconstitutional so far as it attempts to authorize the issue of certain obligations from the Treasury of the State, designated therein as Revenue Bond Scrip, on the ground that such Act contravenes so much of the tenth Section of the first Article of the Constitution of the United States as declares that no State shall "emit bills of credit."

It is claimed by the plaintiff that the obligations contemplated by the second and third Sections of that Act are bills of credit within the meaning of the Constitution of the United States, and that the provisions of such law for the issue of such obligations, intend an emission within the sense and meaning of that Constitution.

Section 3 provides as follows: "That, to carry out the purposes of this Act, the State Treasurer is hereby authorized and required to have printed or engraved on steel, as soon as practicable, Treasury Certificates of Indebtedness, to be known and designated as Revenue Bond Scrip of the State of South Carolina, in such form and of such denominations as may be determined on by the State Treasurer and the President of the Blue Ridge Railroad Company, in South Carolina, to the amount of one million eight hundred thousand dollars; which Revenue Bond Scrip shall be signed by the State Treasurer, and shall express that the sum mentioned therein is due by the State of South Carolina to the bearer thereof, and that the same will be received in payment of taxes and all other dues to the State except the special tax levied to pay interest on the public debt."

The question arises, are the obligations contemplated by this Section bills of credit within the meaning of the Constitution of the United States?

The proper definition of the term "bills of credit" has been settled in the Supreme Court of the United States, after much able and earnest discussion, eliciting marked differences of opinion.

Chief Justice Marshall, in delivering the opinion of the majority of the Court in *Craig* vs. *Missouri*, 4 Peters, 490, declares that the term "bills of credit," as employed in the Constitution of the United States, "signify a paper medium intended to circulate between individuals, and between government and individuals for the ordinary purposes of society," and "that the prohibitions against such emissions comprehends the emission of any paper medium by a State government for the purpose of common circulation."

This definition received much consideration as to its accuracy in the subsequent case

within the terms of the Constitution. To the many indications in the Act to show the intended design, which have been pointed out in the opinion of Mr. Justice Willard, it might be added that the

of *Briscoe* vs. *Bank*, 11 Peters, 257, but was enforced rather than impaired by the decision in the last named case.

The opinion of the majority of the Judges in *Briscoe* vs. *Bank* was delivered by Justice McLean, who, it will be observed, was one of the Judges who dissented in *Craig* vs. *Missouri*. He declares, after reviewing the various definitions of the term in question that had been brought into discussion in *Craig* vs. *Missouri*, that, 1st. "The definition then which does include all classes of bills of credit emitted by the colonies or States is a paper medium issued by the sovereign power, containing a pledge of its faith, and designed to circulate as money."

It is not necessary for the purposes of the present case to inquire whether the foregoing definition is exhaustive of the whole sense and meaning of the constitutional prohibition, for the present case will be found fully within that definition, and, therefore, covered by the authority of the Supreme Court of the United States in the case already cited.

It remains, then, to inquire whether the obligations contemplated by the Act under consideration are intended to have the following characteristics:

1st. That they are to be issued by a State in its sovereign character.

2d. That they were to contain a pledge of its faith; and

3d. That they were intended to circulate as money.

The first and second propositions are settled in the affirmative by the terms of Section 4, which provides, as we know, for a paper to be issued by the State Treasurer, importing to be an obligation on the part of the State to pay a certain sum of money to the bearer. It will, therefore, be necessary only to inquire whether it was the intention of the Act that this paper should circulate as money.

An inquiry of this nature calls into exercise one of the most important and responsible judicial powers incident to a constitutional government. It involves the examination of an Act of the Legislature, with the view of fixing the purpose and intent of the Legislature in the passage of such Act, not merely as a means of effectuating such purpose and intent of the law-making power by means of the judicial authority, but for the purpose of testing the authority of the law-making power itself in the case, under the supreme law of the land.

The principles that should govern such an enquiry are well illustrated in the case of *Craig* vs. *Missouri*, already referred to, and the mode in which they are there applied to a case remakably similar to the one in hand, marks out very clearly the line of inquiry appropriate to be pursued.

To fix this meaning of the term "money," it must be taken in the ordinary sense understood by the community in their mutual dealings. A strenuous attempt was made in the case of *Craig* vs. *Missouri*, and in *Briscoe* vs. *Bank*, to limit the sense of the term "money" as entering into the question of what constitutes a bill of credit to the legal or technical sense of the term, which embraces only the legal coinage of the country, and that which is its legal equivalent, or, in other words, is made legal tender; but that line of argument did not prevail.

The question, properly stated, is whether a particular obligation is what the community regards and deals with as money. The answer to it is that whatever is current in a form convenient to pass from hand to hand and that may be used to pay debts or purchase commodities is, in this sense, money. It is not essential to such character that tender of payment in such substituted medium should have the force and effect of a legal tender, nor that it should have an actual capacity for paying debts and purchasing commodities equal to that of money possessing intrinsic or legal value. That which passes current as money may be depreciated without losing its character as money, and depreciation necessarily implies a diminished capacity for paying debts and purchasing commodities.

Revenue Bond Scrip could never have been intended or proposed as a State security for investment, because it bore no interest, and its value consisted in the fact of its ready capacity and facility in

On the other hand, it is not enough to characterize an obligation as money merely because certain individuals have found it convenient to use it in place of money in their mutual transactions. There must be a dealing in the medium as money by the community as such, although the extent to which such dealing by the community is carried is, perhaps, unimportant to the question.

There are certain characteristics that tend to adapt a paper expressing a promise to pay money or representing money value, to become current in the community as money. It must be in a form convenient to pass from hand to hand. It must be based either on the credit of a government, a corporation, or an individual, or an association of individuals, or upon a fund pledged or set apart for its redemption. It must either have undoubted credit, such as arises from its ready convertibility into money value, or it must tend to supply some want, natural or artificial, of the community in which it is intended for circulation. It must be placed upon the community in quantity or volume sufficient to create an adequate interest and motive to secure its ¦currency; and, finally, it must have a certain denominational character adjusted to the wants of the community in respect to a circulating medium.

An examination of the Act in question will disclose a clear intent to clothe the obligations in question with attributes fitting them for general circulation as money. These attributes will be considered in the order just stated.

1st. Was it intended that the Revenue Bond Scrip should be issued in a form convenient to pass from hand to hand in ordinary transactions of the community?

Section 3 gives to the scrip the form most usual and convenient to serve as paper money, viz: That of the usual bank or treasury note. It is to be printed or engraved on steel in such form and of such denominations as the State Treasurer and the President of the Blue Ridge Railroad Company shall determine. The object of referring this authority as to form and denomination to the Treasurer and the President of the railroad company is obvious. The Treasurer is, by the Act, to receive and pay out this scrip from the treasury as money; and the President of the railroad company is to receive the scrip as the representative of his company, and to realize from its employment, and they are most likely to know what qualities as to form and denomination would have the tendency to give the greatest currency to the scrip at the time of its issue. A certain discretion is left with them for such purpose. While the third Section determines what shall be the substantial character of the scrip, as importing a pledge of the public faith and credit, the form of the instrument, as adapting it in external appearance to the common notion of money, is left with those most concerned with its currency.

2nd. It is to be based by the terms of the Act on the credit of the State Government in its sovereign capacity.

3rd. The Act attempts to confer upon it not only the full credit capable of being conferred by the use of the full faith and credit of the State, but to create an artificial want in the community, tending to give it currency. In the first place, it is made receivable in payment of taxes and all other dues to the State, except the special tax levied to pay interest on the public debt. (Sec. 3.) Again, it is provided that if any such scrip is received in the Treasury for the payment of taxes, the Treasurer is authorized to pay out the same in satisfaction of any claims against the treasury except interest that may be due on the public debt. (Sec. 5.)

These provisions contain two distinct features. The first is a permissive feature affecting each individual in the community who is a tax-payer, and supplying to him a motive to become a purchaser of the scrip. A more energetic means of creating an interest and motive in the community to deal with the scrip, as money, could not be offered short of making the scrip compulsory payment of all debts as between individuals. The other feature involves the communication to the scrip of the capacity of performing all the functions of money in all dealings between State and individuals,

supplying all articles necessary for use or consumption. Its capacity for circulation and its easy convertibility, together with its adaptation to immediate and ready use, would cause a demand for it

excepting only the case of the payment of interest on the public debt. This last feature can have no other significance than that of giving currency to the scrip as money.

It will be observed from the language of the fourth Section, in which the faith and funds of the State are pledged, that such is not in terms that such scrip shall be redeemed by the payment to the bearer on presentation of the amount of money called for by it, but the language is, "that the faith and funds of the State are hereby pledged for the ultimate redemption of said Revenue Bond Scrip."

It is only ultimate redemption, not payment on demand, that is covered by this pledge. What is meant by ultimate redemption is made clear by the succeeding clauses of that Section. It is provided that a certain tax shall be annually levied for the redemption of the scrip, and it is also provided, that the State Treasurer shall "retire at the end of each year from their date one-fourth of the amount of the treasury scrip hereby authorized to be issued, until all of it shall be retired, and to apply to such purpose exclusively the taxes hereby required to be levied." The effect of these provisions is that the holder of the scrip must not look to payment according to the tenor of his scrip, but must seek a market for its circulation under the influence of the pledge of faith and funds for its ultimate redemption. In other words, an attempt is made to give currency to the issue, notwithstanding the absence of any intention or ability to redeem according to the tenor of the promise by obtaining a credit with the community for the amount of scrip put in circulation on the strength of certain special provisions and a general pledge of the faith and funds of the State for its ultimate redemption.

4th. The quantity or volume of the contemplated issue is such as tended to create a strong motive and interest in the community to keep the scrip in circulation as money. The amount, $1,800,000, as compared with the extent of the commercial transactions of the community on which that amount was intended to be placed, affords the clearest indication of an intention so to affect the interest of the community as to secure its circulation as money. It was to be placed at once in private hands as valid obligations on the part of the State. The various provisions of the Act that looked to a distribution among the people preclude the idea that it was intended that the recipients of this large fund should hold it until redemption, or even that it should be kept together in the hands of a limited number of holders. On the contrary, it was clearly intended for dispersion, and the magnitude of the interest in the hands of the first receivers of the scrip was sufficiently large to warrant the assumption that it would become thus diffused throughout the community.

5th. As it regards its adaptation in respect of denomination, we have already seen that authority was conferred on those most concerned with its circulation, to adapt the issue in that respect to the wants of the community. Such a provision shows additional evidence of an intent that the scrip should circulate as money.

Considering the Act in its entire aspect, as well as its integral parts, it is clear that the Legislature intended that the scrip should circulate as money, and that for this reason the provisions of the Act authorizing the issue of scrip are in conflict with the prohibitions of the Constitution of the United States, as to the emission of bills of credit by States.

The Act being unconstitutional, it is void so far as it contemplates the issue of Revenue Bond Scrip. It is unimportant, therefore, to inquire whether the scrip that was actually issued was conformable to and authorized by the Act.

The injunction heretofore issued must be continued until the final hearing and determination of the action.

But it is said that one part of an Act may be declared unconstitutional, and the other parts constitutional. There can be no question as to this, nor to the consequence that follows, which Mr. Cooley, at page 77 of his work on limitations, thus announces: "If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed wholly independent of that which was rejected,

which a State bond, although bearing interest, could not command. It is contended that, as this was a provision to meet a debt of the State, the purpose was to furnish a fund for payment and not a circulating medium. But may not the two co exist? May not the medium of payment be of such a kind and character as to create in itself a circulating currency? It is not the end which the assumption is to accomplish, but the mode and manner designed and the use contemplated. The State might issue certificates of indebtedness for the redemption of its bonded debt, but if it did so in the form and manner and design proposed by the Act of March 2, 1872, would they be less obnoxious to the objection urged against the Revenue Bond Scrip, because they were issued to pay or meet a debt? It is not the purpose of the issue which affects the instrument through which it is made, but the characteristics and incidents which attach to it as a provision and recommendation for a circulating medium.

The order dismissing the motion has been already filed.

*Willard*, A. J., and *Wright*, A. J., concurred.

it must be sustained." The relators seek to apply it here as sustaining the scrip, "not indeed as a bill of credit, but as a valid obligation of the State, which must be redeemed in the manner fixed by the law, which sets forth the terms and obligations of the contract." The relators claim a writ of *mandamus* to require the levy of a tax to pay the Revenue Bond Scrip which they hold. If it is void, and the respondent cannot, therefore, be required to direct it, for what purpose can he order the levy of the tax, the benefit of which is to inure to them, "not as holders of a bill of credit, but of a vested obligation of the State?" The Act provides for the collection of the tax to pay the Revenue Bond Scrip, and if this is void can the respondent look behind it to the consideration on which it was founded, and provide for that in substitution of the void paper? Is the ministerial officer to assume legislative functions?

It is said that "the most startling of all the various propositions stated in the argument of this case is that which it is urged *must* be the result of the Act being unconstitutional. It is that, the Act being void, and the scrip thereby void, the State may retain the consideration received for it, and judicially repudiate its payment." The duties and powers of a Court are of a widely different character from those of the legislative department. The one gives construction to Statutes as they find them, without looking to the effect of their conclusion upon either the State or individuals, through the application of principles by which they are bound to be governed. The other is invested with the general power of enacting laws according to their own sense of justice and of policy, provided they are not within the inhibitions of the constitutions of the State and the United States. If they transcend either of these, a duty more delicate than any other which the Judiciary is called upon to perform, devolves upon it the necessity of declaring their action void. It is not within the province of the Court to inquire into the consideration which these relators may have paid for the scrip, to see how far the State may be bound to compensate them for a loss incurred, as they say, in a contract into which they entered with it on the faith of the Act, which, as they contend, expressed the terms designated by the State itself. We are to decide the case before us. If the issue of the Revenue Bond Scrip by the Treasurer involves the State in some obligation to the holders, which good faith requires it to meet, the duty rests with the Legislature, not the Courts, to measure its extent and declare the mode in which it shall be fulfilled.